21 F.3d 427
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Shirley Marie HARKER, Executrix of the Estate of Charles
Harker, Deceased, Plaintiff-Appellant,
v.
BLACK & DECKER (U.S.), INC., Defendant-Appellee.
 No. 93-3273.
 United States Court of Appeals, Sixth Circuit.
 April 11, 1994.
 
 Before: JONES, BOGGS, and DAUGHTREY, Circuit Judges.
 PER CURIAM.
 
 
 1
 Shirley Harker, executrix of her husband's estate, filed suit against Black & Decker, alleging that a manufacturing defect in a Black & Decker hedge trimmer caused the electrocution of her husband. Mrs. Harker now appeals the district court's order granting Black & Decker's motion for a directed verdict. Because we find that Mrs. Harker failed to present sufficient evidence that the defect was present in the trimmer at the time it left Black & Decker's control, we affirm the district court's order.
 
 
 2
 * In July 1990, Charles Harker decided to clip his hedges with a Black & Decker electric hedge trimmer. Mr. Harker had acquired the trimmer from his brother-in-law, Roger Hodges, in 1989. Hodges purchased the trimmer in 1977; he also purchased an orange extension cord and a yellow extension cord. According to Hodges, both of the cords had three-pronged plugs. Before he gave the trimmer to Mr. Harker, Hodges used it two or three times a year and he occasionally loaned the trimmer to Mr. Harker.
 
 
 3
 On July 18, 1990, Mr. Harker plugged the orange extension cord into the trimmer and the yellow extension cord into an electric plug in the house. Mr. Harker intended to trim a row of bushes located at the edge of his property and situated on an embankment of a small creek. At some point, Mrs. Harker decided to check on her husband. When she approached the creek she saw him lying face down in the creek. She could not see the trimmer, but she noticed that the extension cord was in the creek. She ran back to the house, unplugged the trimmer, and returned to tend to her husband. A neighbor, hearing Mrs. Harker's screams, came over to help. When the neighbor rolled Mr. Harker over, he was still holding the trimmer.
 
 
 4
 The officer who investigated the accident took the trimmer and the orange extension cord to police headquarters, but he left the yellow cord at the Harkers' house. Mrs. Harker attempted to find the yellow cord later, but she testified that she has never located it.[1] The orange extension cord contained no defects that could cause electrocution. After Mrs. Harker filed suit, her expert, Rene Castenschiold, examined the electrical system of the Harkers' house and garage. He determined that there were no problems with the wiring in the house that could have caused Mr. Harker's death.
 
 
 5
 The first disassembly of the trimmer after the accident was videotaped. Using this video as a basis for their testimony, both the Black & Decker expert and Mrs. Harker's expert testified that when the trimmer was disassembled, it was apparent that a connector joining a red wire and a white neutral wire was out of its recess in the housing. The misplacement caused the wires to run over ribs in the housing, resulting in abrasion of the insulation of the red wire when the housing was closed. There was also evidence that an electrical brush in the trimmer's motor was worn out, which would have decreased the trimmer's power.
 
 
 6
 The red abraded wire was not a "hot" wire, since it was part of the neutral wire running from the motor to ground. Consequently, under normal circumstances, the short circuit in the trimmer was harmless. The abrasion in the neutral wire, however, could have caused electrocution if the ground wire path from the trimmer through the extension cords to the grounded outlets was interrupted at some point and the directional flow of electricity was reversed ("reverse polarity").[2] The interruption in the ground would allow the electrical current to change its circuit and the reverse polarity would have turned the neutral wire into a "hot" wire. According to Mrs. Harker's expert, if these two conditions were present, the trimmer would have electrocuted anyone who was grounded and touched the trimmer.
 
 
 7
 Mrs. Harker argued that Mr. Harker could not have caused the wiring defect in the trimmer. She testified that he had never complained to her about the operation of the trimmer and that although her husband owned a few hand tools and one small electrical drill, he was not mechanically inclined. Mrs. Harker indicated on cross-examination, however, that her son, sons-in-law, and Mr. Harker's brother assisted Mr. Harker in making repairs around the house. Mr. Hodges testified that he had never opened or attempted to repair the trimmer or had it repaired by someone else.
 
 
 8
 Mrs. Harker also contended that the trimmer could not have electrocuted her husband in the absence of the short circuit, interruption in the ground, and reversal of polarity. Since neither the trimmer nor the orange extension cord had a defect that could have caused a reversal of polarity or an interruption in the ground, it was Mrs. Harker's position that the missing yellow extension cord must have contained these defects.
 
 
 9
 Black & Decker maintained that there was no evidence that the wiring defect was present in the trimmer when it left Black & Decker's control. One of Black & Decker's experts, Lee Gough, testified that the ease with which the screws in the trimmer were removed by Mrs. Harker's expert, as seen in the video, indicated that someone had previously opened the trimmer. Black & Decker also argued that Mr. Harker was electrocuted as a result of falling into the creek with the trimmer in contact with his body and that the wiring defect inside the trimmer was entirely coincidental and non-contributory because Mr. Harker was using a properly grounded, non-defective, three-pronged yellow extension cord at the time of the accident.
 
 
 10
 After presentation of all of the evidence, the trial court granted Black & Decker's motion for a directed verdict. The district court found that Mrs. Harker had failed to present evidence that a defect existed at the time the trimmer left the control of Black & Decker. The district court also found that Mrs. Harker failed to present evidence to support her expert's theory of causation. The district court stated that Mrs. Harker's case was "devoid of proof" supporting her expert's theory that electrocution could only have been caused by an interruption in the grounding, reversal of polarity, and the short circuit in the trimmer, and not by immersion of the trimmer alone.
 
 
 11
 Mrs. Harker then filed this timely appeal.
 
 II
 
 12
 Mrs. Harker first argues that she offered enough evidence to create a question for the jury on the issue of a manufacturer's defect. A federal court sitting in diversity must apply state law on questions arising under state claims. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822 (1938). In a products liability case,
 
 
 13
 "the plaintiff's burden of proof consists of alleging and proving, by a preponderance of the evidence, that: (1) there was, in fact, a defect[3] in the product manufactured and sold by the defendant; (2) such defect existed at the time the product left the hands of the defendants; and (3) the defect was the direct and proximate cause of the plaintiff's injuries or loss."
 
 
 14
 State Farm Fire & Casualty Co. v. Chrysler Corp., 523 N.E.2d 489, 493 (Ohio 1988) (footnote added) (quoting State Auto. Mut. Ins. Co. v. Chrysler Corp., 304 N.E.2d 891, 894 (Ohio 1973)). "[A]bsent substantial change in the condition in which the product was sold, it may ... be inferred that the design defect was present when the product left the hands of the manufacturer." State Farm Fire & Casualty Co., 523 N.E.2d at 495 (citations omitted).
 
 
 15
 Also, this court "looks to state law in determining whether there was sufficient evidence presented to withstand a motion for judgment notwithstanding the verdict or directed verdict." Calhoun v. Honda Motor Co., 738 F.2d 126, 129 (6th Cir.1984). In Ohio,
 
 
 16
 [w]hen a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party[,]
 
 
 17
 the court must grant the motion. Ohio Civ.R. 50(A)(4). The court's determination is a question of law; "[t]he 'reasonable minds' test of Civ.R. 50(A)(4) calls upon the court only to determine whether there exists any evidence of substantial probative value in support of that party's claim." Ruta v. Breckenridge-Remy Co., 430 N.E.2d 935, 938 (Ohio 1982). This court applies Ohio law and reviews de novo the grant of a motion for a directed verdict. Salve Regina College v. Russell, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221 (1991).
 
 
 18
 Mrs. Harker relies on Cincinnati Ins. Co. v. Volkswagen of America, Inc., 502 N.E.2d 651 (Ohio Ct.App.1985) and Nash v. General Elec. Co., 410 N.E.2d 792 (Ohio Ct.App.1979) to support her contention that she presented enough evidence to raise the inference that the defect existed at the time that the trimmer left Black & Decker's control. In Cincinnati Ins. Co., the Ohio Court of Appeals overturned a trial court's grant of a motion for a directed verdict for the defendant. In that case, the plaintiffs' car and home were extensively damaged after the garaged car caught on fire. 502 N.E.2d at 652. The plaintiffs had purchased the car new in 1976 and the fire occurred in 1981. Id. at 652-53.
 
 
 19
 The defendant argued that since the car had undergone substantial changes in the six years between the time the car was manufactured and date of the fire, the defendant could not be held liable for the damages. Id. at 655-56. These changes included the installation of a stereo-radio, speakers, cruise control, air conditioning, electric antenna, and a Citizens Band radio. Ibid. Also, the car had been involved in a collision that extensively damaged its front-end, and several people, including one of the plaintiffs, had attempted to repair problems with various relays. Ibid.
 
 
 20
 The plaintiffs' expert testified that there was evidence that the fire started in the main electrical cable harness and that he found no evidence to suggest that any of the later actions caused the fire. Id. at 656. The court of appeals concluded that "there was nothing in the record to establish that the additional electrical appliances were other than normal and expected uses of such vehicle" and that there was sufficient evidence to go to the jury on the issue of whether the defect in the main electrical cable harness existed at the time the vehicle left the defendant's control. Ibid.
 
 
 21
 Another Ohio court of appeals reached a similar result in Nash v. General Elec. Co., supra. In Nash, the court of appeals reversed the trial court's grant of a directed verdict for the defendant. In that case, a fire virtually destroyed the plaintiffs' house. Id. at 793. Experts testified that a five-year old toaster oven caused the fire. One expert also testified that there was a crack in the ceramic insulator in the toaster oven that caused an electrical failure. This failure, in turn, caused an arcing between the conductors, which then caused the fire. Id. at 794. There was no evidence that the toaster had sustained any damage in shipment, that anyone had repaired the toaster, that the toaster had malfunctioned before it started the fire, or that the toaster had been dropped or damaged in any way. Id. at 793.
 
 
 22
 The court found that there was circumstantial evidence that the defect existed at the time the product left the hands of the defendant. Id. at 794. The court also concluded that since there was no evidence that the toaster oven had been abused, mistreated, or damaged, "a jury could have drawn the inference that the product was defective at the time it was manufactured and sold by the defendant." Id. at 795.
 
 
 23
 On the other hand, Black & Decker relies primarily on State Farm Fire & Casualty Co., supra. In that case, the plaintiffs' garaged K-Car caught on fire; the vehicle was totally destroyed and the house was damaged. Id. at 490. At trial, the plaintiffs admitted that the dealer who sold them the car made repairs to the electrical system and that the instrument panel was removed to correct a rattling noise. Id. at 491. There was also testimony that during one of these repairs, the mechanic may have cut out a "fuse link" safety device and replaced it with ordinary wire. The experts agreed that the fire started under the dashboard but that the car was too badly burned to determine which wire started the fire. Ibid.
 
 
 24
 The plaintiffs argued that cars that are properly manufactured do not have a history of electrical problems like those encountered in their car. They alleged that the history of the car was sufficient to demonstrate an electrical defect and to permit the inference that the defect caused the fire. Id. at 492. The trial court, however, granted the defendant's motion for a directed verdict. This holding was overturned by the intermediate appellate court. Ibid.
 
 
 25
 The Ohio Supreme Court, however, reinstated the directed verdict. The court noted that "evidence presented in other products liability cases before this court demonstrated that the claimed defects were present at the time the products left the hands of the manufacturer." Id. at 497. The court cited Nash and Cincinnati Ins. Co. for this proposition. The court concluded that in the case of the K-Car, the evidence did not "permit reasonable minds to conclude" that the defect was present when it left the control of the manufacturer. Id. at 496. The court found that it was "equally likely that the defect arose as a result of negligent repair when [the dealer] removed the dashboard of [the plaintiffs'] vehicle." Id. at 497. The court held that a directed verdict was proper because "[r]easonable minds ... must speculate as to whether an electrical defect was present when the ... vehicle left the manufacturer." Ibid.
 
 
 26
 These cases suggest that a plaintiff is entitled to an inference of a manufacturing defect if the defect is the type that could only have arisen during the manufacturing process or if the plaintiff presents affirmative evidence that negates any act on his part that could have caused the defect. In this case, however, the evidence adduced by Mrs. Harker is insufficient to give rise to an inference of a manufacturing defect because other unchallenged evidence demonstrates the strong likelihood that the defect arose as the result of Mr. Harker or his family opening the trimmer. Black & Decker's argument is supported by Gough's expert testimony that the screws from the trimmer's housing must have been removed at least once before, since the videotape of the first inspection of the trimmer indicated that the screws were not very tight.
 
 
 27
 On the other hand, Mrs. Harker's only proof on this issue is that Mr. Harker had little experience with power tools and that she did not believe her husband had ever attempted to repair a power tool. Mrs. Harker also testified that Mr. Harker had never mentioned that the trimmers were not working properly. With the exception of Hodges, Mrs. Harker chose not to call as witnesses other people who also had access to the trimmer and could have opened it. Mrs. Harker failed to rebut Black & Decker's evidence; thus, her case is distinguishable from both Nash and Cincinnati Ins. Co. because she has not presented any evidence that the defect is the sort that must have arisen during the course of the manufacturing process. Considering the state of the evidence, the district court was correct in directing a verdict in favor of Black & Decker. As in State Farm Fire & Casualty Co., reasonable minds could only have speculated as to whether the wiring defect existed at the time the trimmer left Black & Decker's control.
 
 
 28
 Because we find that there is no evidence of substantial probative value in support of Mrs. Harker's claim that the wiring defect was present in the trimmer when it left the control of Black & Decker, we need not reach the issue of causation raised by the parties. Accordingly, we AFFIRM the district court's grant of a directed verdict for Black & Decker.
 
 
 
 [1]
 There is conflicting testimony on this issue. Mrs. Harker testified that Hodges told her that he had thrown the yellow cord away after the accident because it upset him. Hodges, however, testified that he left the cord at the Harkers' house when he moved to Florida after the accident
 
 
 [2]
 Reverse polarity cannot, by itself, cause electrocution. Reverse polarity commonly occurs when the directional flow of electricity is reversed by plugging a cord into an outlet upside down. Since the reversed path of the electricity is still contained within the wires, there is no danger of electrocution or shock as long as the directional flow is uninterrupted. A three-pronged plug makes reverse polarity impossible, because there is only one way to insert the cord into the outlet
 
 
 [3]
 A "defect" is defined as follows:
 [a] product is defective in manufacture or construction, if, when it left the control of its manufacturer, it deviated in a material way from the design specifications, formula, or performance standards of the manufacturer, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards....
 Ohio Rev.Code Ann Sec. 2307.74.